## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| RAINBOW PUSH COALITION; | \| | |
| HERMAN SMITH; | \| | |
| THE ESTATE OF JAMES | \| | |
| CHRISTOPHER | \| | |
| JOHNSON III | \| | |
| | \| | |
| Plaintiff, | \| | |
| v. | \| | |
| | \| | CIVIL ACTION |
| HON. NATHAN DEAL, Governor of the | \| | FILE NO._____ |
| State of Georgia, in his official capacity; | \| | |
| HON. SAMUEL S. OLENS, Attorney | \| | |
| General of the State of Georgia, in | \| | |
| his official capacity, | \| | |
| | \| | |
| Defendants. | \| | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
## CLASS ACTION

COMES NOW Plaintiffs in the above-styled action, and seek to have the

provisions of O.C.G.A. 16-3-23.1 also known as the Georgia "Stand Your Ground

Law", as adopted in SB 396, declared unconstitutional on its face, and seek to

enjoin its enforcement, and in support thereof respectfully show this Court the

following:

## PRELIMINARY STATEMENT

### 1.

O.C.G.A. 16-3-21(A) states in relevant part:

(a) A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force; however, except as provided in Code Section 16-3-23, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

2.

In SB 396, Georgia created an expansive and overly broad right to self-defense that, among other things: 1) statutorily removes the duty to retreat from the self-defense context; 2) creates a new statutory right to use deadly force based upon the subjective "reasonable belief" that such force is necessary to prevent harm; (3) denies individuals equal protection under the law as the use of the defense is colored by the race, sex, age and social economic status; (4) violates the due process rights of all Georgia citizens by failing to properly provide notice of the parameters of the law.

3.

Governor Sonny Perdue signed SB 396 on April 27, 2006 with the law taking effect on July 1st 2006.

4.

If allowed to continue in effect, SB 396 will significantly harm Georgians, and particularly Georgians of color, for at least three reasons:

5.

First, SB 396 has and will subject Georgians to uneven and arbitrary application of the law. All Georgians, and particularly those of color, will be compelled to at all times prove that they are not taking part in any action which may lead an individual to form a "reasonable belief" that they are posing a threat to them.  Actions which individuals have claimed caused them to form a "reasonable belief" have included playing loud music in a vehicle, pulling into the wrong driveway or in another state walking home with a bag of skittles and ice tea. This is because SB 396 makes individuals who are perceived by society to be predisposed to violence presumptively a threat and therefore require a lower level of justification to use deadly force against.  This law incorporates these societal prejudices and predispositions into Georgia criminal procedures.

6.

Second, SB 396 will cause countless Georgians—specifically Georgians of color—to be erroneously deprived of the benefits of the Stand Your Ground law. These same societal presumptions have prevented many Georgians from availing themselves of this defense.  Simply put, it is highly unlikely that an average 25 year old African American male will be able to invoke the defense that he held a "reasonable belief" that an 80 year old unarmed white female posed a threat to him and justified the use of deadly force against her.

7.

Criminal laws are not supposed to make distinctions between individuals based on their race, sex, age or other factors. There cannot be one speed limit for young black males and a different speed limit for older white females. Similarly, there cannot be a divergent Stand Your Ground standard for individuals based on the same. These deprivations will force individuals to risk felonious assault or death out of fear that invoking Stand Your Ground will result in prosecution.

8.

Third, SB 396 interferes with the core doctrine of self-defense as a defense of last resort.  Instead, Stand Your Ground allows an individual the shoot first as a preventative measure.   By eliminating the duty to retreat and using the "reasonable belief" standard Georgia, has created a perfect storm for arbitrary killings with no recourse and a lack of faith in the law within the people of Georgia.

9.

SB 396 constitutes a sweeping and comprehensive state scheme expanding the ability of individuals to use deadly force based upon minimal or no provocation in Georgia.

10.

The Act includes provisions: creating immunity from criminal and civil prosecution if it is determined that the use force was justified and transforms ordinary police officers into judges and juries as they determine if the individual will even be arrested from the homicide.

11.

The State of Georgia's intent to displace traditional self-defense doctrine is apparent not only from the scope and design of SB 396, but also from the express statements of the members of the Georgia General Assembly who drafted and supported the law.

12.

SB 396 is unconstitutional in a myriad of ways.  It violates the Equal Protection Clause and right to Due Process under the Fourteenth Amendment. By creating a law so broad as to not apprise average citizens of its full boundaries SB 396 violates the doctrine for "void for vagueness" and destroys many of the core civil rights and liberties secured by the U.S. Constitution.

13.

The Plaintiffs in this action have and will continue to suffer serious and irreparable violations of their constitutional rights and civil liberties if SB 396 is allowed to continue in effect.

14.

The individually named Plaintiffs bring this action on behalf of themselves and a class of all others similarly situated to obtain preliminary and permanent injunctive relief and a declaration that SB 396 is unconstitutional.

JURISDICTION AND VENUE

15.

This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' claims under the U.S. Constitution, which are brought both directly and under 42 U.S.C. §§ 1981 and 1983.

16.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343 because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights and to secure equitable or other relief for the violation of those rights.

17.

This Court has supplemental jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367 because it is so related to the federal claims that it forms part of the same case or controversy under Article III of the U.S. Constitution.

18.

This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure Rule 57.

19.

Venue is proper in this District under 28 U.S.C. § 1391(b). Defendants are sued in their official capacity and their residences are all located within this District and this Division. All of the events giving rise to this Complaint occurred within this District.

PARTIES

PLAINTIFFS

20.

.   Plaintiff, **The Rainbow PUSH Coalition** (RPC) is a multi-racial, multi-issue, progressive, international membership organization fighting for social change.

21.

RPC was formed in December 1996 by Reverend Jesse L. Jackson, Sr. through the merging of two organizations he founded earlier, People United to Serve Humanity (PUSH, 1971) and the Rainbow Coalition (1984). With headquarters in Chicago and offices in Washington, D.C., Atlanta, Detroit, Houston, Los Angeles,  New York, and Oakland, we work to make the American

Dream a reality for all our citizens and advocate for peace and justice around the world. We are dedicated to improving the lives of all people by serving as a voice for the voiceless.

22.

One key way that RPC achieves its goal of providing a voice to the voiceless is by educating the community about city ordinances of which they would otherwise be unaware. Other RPC functions include: providing leadership training, conducting community organizing for human rights, holding community forums on a range of issues, and hosting monthly meetings on issues facing the Georgia communities. SB 396 harms RPC by causing the organization to divert significant resources away from activities central to its mission. For example, SB396 has caused RPC to hold several rallies to oppose the law, devote significant amounts of Radio airtime on both WAOK 1380am and Love850am to discuss the issue of Stand Your Ground. Additionally, RPC has had to divert important resources to the preparation of the instant suit. RPC has been unable to produce many research efforts on corporate diversity and other community issues which it traditionally endeavors to produce in order to challenge this law.

23.

Plaintiffs Carrie Johnson and James Christopher Johnson Jr. are the parents of **James Christopher Johnson III** (hereinafter "Chris Johnson") – who is

African American - and have suffered irreparable harm due to the Stand Your Ground Law. On March 30, 2012, Chris Johnson and his girlfriend Ashley Danielle Knapp – who is Caucasian - were patrons at the "Corner Tavern" in Newnan, Georgia. During the evening Adam Lee Edmondson – who is Caucasian - approached Ms. Knapp and made a rude gesture that led to a non- physical confrontation between Chris Johnson and Mr. Edmondson.

24.

The confrontation ended when Edmondson's friend took him away from the area.  The following night, March 31, 2012, while Ms. Knapp was again with Chris Johnson, Mr. Edmondson (now in possession of a concealed loaded firearm) approached Ms. Knapp once again. Ms. Knapp told Mr. Edmondson several times to leave her alone but he refused to do so.  Ms. Knapp asked one of her friends to go get Chris Johnson and the two security guards for assistance.

25.

Surveillance video from the Corner Tavern shows Chris Johnson walking up to Mr. Edmondson and requesting that he cease contact with Ms. Knapp.  Mr. Edmondson refused to do so and made inflammatory statements that caused to Mr. Johnson to strike him with his hand.  Bystanders quickly intervened and separated the two men.  After sometime had passed and while the interveners were still present, Mr. Edmondson pulled out his concealed firearm, reached around another

patron, pointed the firearm into the chest of Chris Johnson and fired one shot killing Chris Johnson. Mr. Edmondson was arrested and charged with murder.

26.

During his trial Mr. Edmondson invoked Stand Your Ground as his defense for killing Chris Johnson.

27.

The Jury found that despite Mr. Johnson not being armed, the confrontation being over, a cooling off period passing and the presence of security guards to diffuse the situation that Mr. Edmondson was not guilty of murder under the Stand Your Ground law.

28.

The Georgia Stand Your Ground law has caused irreparable harm to the family and estate of Mr. Johnson. It has enabled the person that killed their son in cold blood to get away with murder. For this reason so long as the Stand Your Ground law remains in effect the estate of Mr. Johnson will continue to suffer from its application.

29.

Plaintiff **Herman Lee Smith III**, is a 21 year-old African American male who was convicted of Felony Murder on August 6, 2013 in the Superior Court of

Carroll County, Georgia. He was accused of unjustifiably gunning down Cardarius Steagall – an African American male- on November 18, 2012 at a private birthday party in Bowdon, Georgia.  During his trial, Smith asserted Georgia's well-established self-defense law as well as Georgia's Stand Your Ground law as the basis of his defense.

30.

Despite the clear and undisputed evidence that he was acting in defense of himself and others, Herman Smith was ultimately convicted of felony murder and was sentence to life plus 10 additional years.

31.

The facts in Herman Smith's case clearly established that he had the right to defend himself and others.

32.

During his trial several witnesses for both the State of Georgia and the defense testified that Herman Smith did not provoke Cardarius Steagall and that in fact the two men did not know one another. Witnesses further testified that on the night of the shooting that they saw Cardius Stegall with a gun, heard him threaten to shoot several people, saw Cardarius Stegall moments before the shooting sitting and staring in the direction of Mr. Smith, that Cardarius Stegall was seen re-

entering the establishment with a gun in his right hand, that individuals yelled for Mr. Stegall to stop, that Cardrius Stegall broke away from several people who were trying to stop him from re-entering the establishment with a gun, that Mr. Stegall walked towards Mr. Smith with a gun in his hand and that Mr. Smith shot Mr. Stegall to prevent him from harming either himself or other in the establishment.

33.

Investigator Brian Finley of the Carroll County Sheriff's Office testified that their investigation revealed that Cardarius Stegall had the intentions to enter that establishment to shoot and kill Dwight Clendon Thomas Jr.  A witness testified that Cardarius Stegall was walking towards Dwight Thomas with a gun in his hand before he was shot by Herman Smith and that Smith was standing directly beside Dwight Thomas when the shooting took place.

34.

Despite this overwhelming evidence Mr. Smith was convicted of felony murder. The Jury found that he did not have a "reasonable belief" that his life was in danger despite an armed man approaching him.

35.

This sort of uneven, arbitrary and capricious series of rulings has damaged the families of the victims and all citizens of the State of Georgia.

DEFENDANTS

36.

Defendant Nathan Deal resides at 391 West Paces Ferry Road, Atlanta, GA 30305.  Defendant Nathan Deal is Governor of the State of Georgia and office in his official capacity as Governor of the State of Georgia in the Capitol Building of the State of Georgia, located at 206 Washington Street, SW, Atlanta, GA 30334.According to the Georgia Constitution, "[t]he chief executive powers" are "vested in the Governor."  Ga. Const. art. 5 § 2, ¶ 1.  Under Georgia law, the Governor "shall provide for the defense of any action…the result of which is of interest to the state because of any claim inconsistent with the state's sovereignty, jurisdiction, or rights."  O.C.G.A. § 45-12-26. As such, Defendant Deal is responsible for the enforcement of the Act in the State of Georgia and is an appropriate defendant in this case. Defendant Deal is sued in his official capacity.

37.

Defendant Samuel S. Olens is the Attorney General of Georgia.  According to the Georgia Constitution, the attorney General is "the legal advisor of the executive department" and "shall perform such…duties as shall be required by law." Ga. Const. art. 5, §3, ¶IV;  *see also* O.S.G.A. § 45-15-3 (detailing Attorney

13

General's powers and duties). As such, Defendant Olens is responsible for the enforcement of the Act in the State of Georgia and is an appropriate defendant in this case.  Defendant Olens is sued in his official capacity.

<u>FACTS</u>

HISTORY AND LEGISLATIVE INTENT

38.

In 2006, Georgia, codified its castle doctrine and doctrine of self-defense into a group of statutes known as the "Stand Your Ground" law.  This new statutory scheme abrogates the duty to retreat before using deadly force.

39.

A typical retreat rule, or duty to retreat, holds that the victim of a murderous assault must choose a safe retreat instead of resorting to deadly force in self-defense, unless the victim is at home or in his place of business.

40.

Prior to 2006, Georgia statutory law did not impose a duty to retreat on victims of attack.  The Georgia code allowed that persons who had taken no part in the instigation of a violent or potentially violent encounter had no duty to retreat under Georgia Code.   Code section 16-3-21 stated that "a victim of an attack is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent

death or great bodily injury to himself or herself or a third person or to prevent the
commission of a forcible felony."

41.

While there was no statutory duty to retreat in Georgia, and thus no
requirement for a codified castle doctrine excepting a residence, the Code
nevertheless eliminated the requirement that force be met with no greater than
equal force when acting in defense of a habitation. If the person claiming the
affirmative defense of justification was not the aggressor, Georgia courts did not
imply a duty to retreat where the Code was silent.  In 1898, the Georgia Supreme
Court outlined the rule for victims of attack, holding that there is no duty to retreat
"if the circumstances are sufficient to excite the fears of a reasonable man that a
felonious assault is about to be made upon him, and the slayer, who is free from
blame, acts under the influence of such fears."

42.

However, by statutorily codifying the right to stand one's ground outside of
an individual's residence or place of business, the Act created a new right for
individuals to use deadly force based upon their "reasonable belief" that a violent
encounter may happen without first attempting to withdraw and without regard to
the proportionality of the response.  This new right allows individuals to respond to

what they believe to be a threat with deadly force even where no deadly threat existed without the need to first attempt to escape the threat.

43.

The act does not define what actions, circumstances or conditions would constitute a "reasonable" fear needed to trigger the use of deadly force.

44.

The act does not define what actions an individual may take to prevent another from using deadly force against them where the other is mistaken in their "reasonable belief" that force is needed.

45.

The Act does not account for societal and cultural biases which result in a presumption of criminality (or presumptions of victimization) against certain socio-economic and ethnic groups which results in the unequal allocation of the presumption of the presentation of an eminent threat sufficient to justify the use of deadly force.

LEGISLATIVE PROCESS

46.

State Senator Greg Goggans of the 7th District of Georgia introduced SB 396 to the Georgia Senate.  Senators Greg Goggans, Eric Johnson, Tommie

Williams, Jim Whitehead, and Renee Unterman of the 7th, 1st, 19th, 24th, and 45th

districts, respectively, and others sponsored SB 396.

47.

On January 10, 2006, the Senate first read the bill and referred it to the

Senate Judiciary Committee. The Committee offered an initial substitute to the bill

as introduced on February 1, 2006.

48.

This first substitute added the purpose "to amend Article 1 of Chapter 11 of

Title 51 of the Official Code of Georgia Annotated, relating to general provisions

relative to defense to tort actions, so as to provide for civil immunity," in addition

to a section providing for immunity from civil liability for threat or use of force in

defense of habitation. On February 2, 2006, the Senate read the bill for the second

time. The Senate recommitted SB 396 to the Senate Committee on Judiciary on

February 23, 2006.

49.

The Committee favorably reported the bill on February 28, 2006, proposing

a second substitute. The Committee proposed removing section 1 references to "a

person not engaged in a criminal activity," "who is attacked" and "in a place where

he or she has a right to be" and replacing the language with references to specific

Code sections. Members of the Committee were concerned that such terms would

need to be defined by the courts and could ultimately limit the common law absence of a duty to retreat.

50.

The Committee also wanted to ensure that the Act would encompass all elements of the other Code sections, such as the justifiable use of force to prevent a forcible felony.

51.

The substitute featured altered wording of section 2 from "unless any deadly force used by such person utilizes a weapon the carrying or possession of which is unlawful" to "unless in the use of deadly force, such person utilizes a weapon the carrying or possession of which is unlawful."

52.

The Committee also proposed changing the wording of section 3 from "shall not be held liable in any civil action" to "shall not be held liable to the person against whom the use of force was justified or to any person acting as an accomplice or an assistant to such person in any civil action."

53.

Members of the Committee wanted to ensure a cause of action for innocent bystanders injured by a victim's unreasonably dangerous response to a reasonable threat on his or her life.

54.

On March 2, 2006, the Senate adopted the second Committee substitute, and passed SB 396 by a vote of 40 to 13.

55.

The Georgia House of Representatives first read SB 396 on March 6, 2006. The House read the bill a second time on March 8, 2006 and committed it to the House Committee on Judiciary Non-Civil. On March 22, 2006 the Committee favorably reported SB 396 with no substitutes or amendments.

56.

The House read the bill for a third time on March 24, 2006 and adopted it that day by a vote of 115 in favor to 42 against. The Senate sent SB 396 to Governor Perdue on April 4, 2006.

KEY PROVISIONS

57.

The following are some of the key features of SB 396's expansion of "self-defense".

**SECTION 1**

58.

Section 1 of SB 396 authorizes a person to use deadly force in defense of themselves, others, their habitation, their property, or the property of others.  Prior

to the enactment of Stand Your Ground an individual needed to be the "victim" of a crime prior to the use of deadly force. Under SB 396 an individual need only have a "reasonable belief" that a crime may take place.

59.

This expansion means that any individual who holds a "reasonable belief" that another intends to commit a violent act against them should be protected by Stand Your Ground. However, in practice this has not been the case.

60.

In September 2005, McNeil (an African American) contracted to buy an unfinished home from Epp Elevations, a small building company owned by Brian Epp (a Caucasian) and his wife.   On December 6, 2005, Epp went to McNeil's house to complete required work.   McNeil's son, La'Ron, was home and called McNeil to report that someone was in the backyard.   Believing that Epp was a trespasser, La'Ron confronted Epp and asked him to leave, and an argument ensued during which Epp pointed a knife at La'Ron.   La'Ron called McNeil to report this incident to him.

61.

In response, McNeil headed home in his car.   On the way back he reported to an emergency 911 operator that a man was on his property and had pulled a knife on his son.   Moments later, McNeil told the operator, "I'm at the property

now . and there's the builder and I may get ready to whip his ass right now.   So

get the cops here now."   As McNeil was pulling into his driveway, he retrieved an

automatic handgun from his car's glove compartment, removed it from its case, and

loaded it with ammunition.

62.

An eyewitness who was across the street heard McNeil and Epp arguing

loudly.   A few minutes later he heard a loud pop and saw smoke and McNeil

pointing his hand toward the ground and stepping backward.   Epp was in the yard

between McNeil's house and the one next door and walking toward McNeil.

McNeil continued to back up with his hands pointed toward the ground and said

"Back up, I am not playing with you."   Epp increased his speed toward McNeil

and McNeil raised his gun and fired at Epp's head.   Epp's hands were at his sides,

and the eyewitness did not see him raise his hands or see any weapons in his hands.

63.

Later, an officer arrived at the scene and found Epp on the ground with a

fatal gunshot wound to the head.   McNeil informed the officer that Epp had

pulled a knife on him and then McNeil shot him.   The officer saw a knife clipped

inside the right hand pocket of Epp's pants.   A forensic investigator from the

Cobb County Medical Examiner's Office also responded to the scene and noticed

that the knife in Epp's pocket was folded.   Dr. Brian Frist, the Chief Medical

Examiner of Cobb County, later determined that the abrasions on Epp's face

indicated that he had been shot at a distance of less than three feet.    There were no

abrasions on Epp's hands to indicate that he had raised his hands to defend himself.

64.

The evidence was sufficient to enable a rational trier of fact to find McNeil

guilty of all of the crimes for which he was convicted beyond a reasonable doubt.

Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).    See

also, e.g., Jolley v. State, 254 Ga. 624(1), 331 S.E.2d 516 (1985) (despite claim of

self-defense, evidence supported felony murder conviction based on aggravated

assault where defendant retrieved pistol in anticipation of confrontation and told

victim to leave before shooting him).    Indeed, from the evidence presented, the

jury was authorized to conclude that McNeil decided to confront Epp with the

specific purpose of "whip[ping] his ass" before Epp even knew that McNeil was on

his way to the scene;  that McNeil had time to stop in his driveway, retrieve a gun

from his glove compartment, take the gun out of its case, load it, exit from his car,

and "argue loudly" with Epp for a few minutes before firing the first shot at him;

 and that McNeil lied to police when he claimed that he had shot Epp because Epp

had "pulled a knife on him" during the confrontation (because other eyewitness

testimony showed that Epp had no weapon in his hands at the time of the shooting,

and further testimony showed that Epp's knife was folded and in his pocket after he

had been shot).   Because "[w]itness credibility is a matter to be determined by the jury, as is the question of justification; . the jury was free to accept the evidence that the shooting[ ][was] not done in self-defense . and to reject any evidence offered by [McNeil] in support of a justification defense."  (Citation omitted.) Harris v. State, 279 Ga. 304, 306(2), 612 S.E.2d 789 (2005).

65.

Under either the previous Georgia Law or SB 396 McNeil should have been immune from prosecution as he subjectively held a "reasonable belief" that a crime was going to be committed against himself. However, because of the vague and imprecise language of the Law the determination of what was subjectively within the mind of an individual is left to the arresting officer to determine if to even bring charges and then later to a Judge and Jury to determine if that person actually believed they were facing a reasonable threat.

66.

Clearly, there is no way for an individual to comport their activities to be within the parameters of the SB 396 because the law only comes into effect after the incident at which point the person finds out if what they have done is legal or illegal. Clearly , McNeil believed that he was  acting within the law. And further based upon the language of the law it would appear that by using deadly force to repel the perceived threat of an armed man charging towards him with a weapon in

his pocket that he had acted within the parameters of the law. However, as is made clear in this example the law does not apply uniformly in all situations.

67.

Section 1 effectively requires all persons in Georgia to "guess" if the action which they are taking will fall within what others believe to be reasonable.  It is beyond question that we would not require individuals to guess the speed limit. There is no law which says individuals are allowed to go the speed which they "reasonably believe" is correct and prudent. But in a far more serious context we are leaving the lives of Georgians up to chance.

**SECTION 2**

68.

Section 2 fundamentally creates a second class of citizen in Georgia. A class of citizen not allowed to defend themselves from eminent threats of death even within his own home. Section 2 states that individuals shall be immune from criminal prosecution "unless" any deadly force used by such person utilizes a weapon the carrying or possession of which is unlawful by such person.

69.

In Georgia most convicted felons – even those convicted of non-violent felonies- are forbidden from possessing a weapon. Thus, this law makes it illegal to –even if justified- defend one's self and one's family or habitat from a legitimate

threat to their lives.  This creates a second class of citizens who may never avail

themselves of self-defense for any reason.  There is neither law nor rationale which

justifies an individual being forced to make the impossible of choice of allowing

another to murder them or their families or face a conviction for defending the

same.

70.

This incongruent result robs these individuals of their fundamental right to

life and is in many ways serves as a permanent disability long after they have

served whatever criminal sentence which was enacted.

CLASS ACTION

71.

The Individual Plaintiffs bring this action on behalf of themselves and all

other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a)

and 23(b)(2). The class, as proposed by Plaintiffs, consists of all persons:

(a)    who as a result of their race, national origin, or perceived identity are or
       will be subject to prosecution for attempting to invoke Stand Your
       Ground as a defense or who will be the victims of homicides at the hands
       of individuals invoking defense pursuant to the provisions of SB 396; or

(b)    who are or will be unable to determine the parameters of the State's self-
       defense laws as a result of the broad nature of the provisions of SB 396;
       or

(c)    who are or will be deprived of equal protection rights due to the unequal
       application of the provisions of SB 396.

72.    .

The requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(2) are met here, in that the class is so numerous that joinder of all members is impracticable.

73.

There are questions of law and fact common to the proposed class, including: (1) whether SB 396 violates the U.S. Constitution and federal law; (2) whether SB 396 violates the doctrine of Void for Vagueness; (3) whether SB 396 infringes on the presumption of innocence based on an individual's race, sex or age; (4) whether SB 396 violates the Equal Protection clause of the U.S. constitution; (5) whether SB 396 violates the Due Process clause of the U.S. Constitution. These questions predominate over any questions affecting only the Individual Plaintiffs.

74.

The claims of the Individual Plaintiffs are typical of the claims of the proposed class.

75.

All of the Individual Plaintiffs will fairly and adequately represent the interests of all members of the proposed class because they seek relief on behalf of the class as a whole and have no interests antagonistic to other members of the class.  Finally, Defendants have acted and will act on grounds generally applicable

to the class in executing their duties to enforce SB 396, thereby making appropriate final injunctive relief with respect to the class as a whole.

## DECLARATORY AND INJUNCTIVE RELIEF

### 76.

An actual and substantial controversy exists between Plaintiffs and Defendants as to their respective legal rights and duties. Plaintiffs contend that they face an imminent threat of harm if SB 396 is enforced, and that this law violates the U.S. Constitutions and federal law. Defendants are obligated to enforce this law unless it is found to be illegal.

### 77.

In violating Plaintiffs' rights under the U.S. and federal law, Defendants have acted and will be acting under color of law.

### 78.

If allowed to continue in effect, SB 396 will cause irreparable injury to Plaintiffs.

### 79.

Plaintiffs have no plain, speedy, and adequate remedy at law against SB 396 other than the relief requested in this Complaint.

### 80.

If SB 396 continues in effect, the Plaintiffs and other individuals of color in Georgia will continue to be subject to uneven and arbitrary enforcement including plaintiffs Herman Smith, the Estate of James Christopher Smith and members of the proposed plaintiff class.

81.

In doing the things alleged in this Complaint, Defendants will deny Plaintiffs' rights secured by the U.S. Constitution and federal law.

82.

Defendants' enforcement of SB 396 will constitute an official policy of the State of Georgia.

83.

Plaintiffs are entitled to a declaration that SB 396 is unconstitutional on its face and to an order preliminarily and permanently enjoining its enforcement.

## CAUSES OF ACTION

### COUNT ONE:
### VIOLATION OF THE UNITED STATES CONSTITUTION
### FOURTEENTH AMENDMENT DUE PROCESS

84.

Plaintiff incorporates herein the allegations contained in the paragraphs preceding this Count.

85.

The challenged provision of O.C.G.A. §16-3-23.1, provides that a person who uses threats or force in accordance with Code Section 16-3-21 has no duty to retreat prior to the use of deadly force in defense of himself "if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself."

86.

The term "reasonably believes" is not defined in the Statute.

87.

The term "reasonably believes" is not defined anywhere in Title 16, the CRIMES AND OFFENSES title of the Georgia Code.

88.

It is not clear what actions would create a "reasonable belief" that deadly force is necessary.

89.

Under one possible interpretation, the phrase would be a subjective assessment of what the individual asserting the defense personally believed at the time.  Under another possible interpretation, the phrase would apply an objective standard of what a reasonable person would have believed in a similar situation.

90.

A law is void for vagueness if persons of common intelligence must necessarily guess at its meaning and differ as to its application.  A law that is void for vagueness violates due process, which is protected by the Fourteenth Amendment to the United States Constitution.

91.

The challenged provision of the Statute does not give individuals fair notice of who it applies to nor what standards apply.  It engenders the possibility of arbitrary and discriminatory enforcement.  A person has no way of knowing what actions will trigger a "reasonable belief" and thus comport their actions as to not trigger another's right to stand their ground and use deadly force.  Additionally, an individual seeking to stand their ground and assert self-defense has no way of knowing if their "reasonable belief" comports with the standards protected by the challenged law.

92.

Vague laws may discourage citizens from engaging in perfectly legal conduct simply because they do not understand what the law prohibits, and want to ensure that they do not subject themselves to criminal penalties. Therefore, if the statute has the likelihood of deterring citizens from engaging in behavior that is both legal and constitutionally protected, the strictest standard of review is necessary, and in such a case, the statute will almost always be struck down. In

addition, if the conduct the law threatens to deter is beneficial to society at large, the general population is harmed when the individual ceases his beneficial legal conduct to conform to what he assumes the law requires.

93.

Plaintiff seeks a declaration that the challenged provisions of the Act, on its face, are unconstitutionally void for vagueness, and seek a preliminary and permanent injunctive relief preventing its enforcement.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays as follows:

a) That the summons issue and process be served on the Defendants;

b) That the Court declare the challenged provisions of the Statute to be unconstitutional;

c) That the Court grant a preliminary injunction against continued enforcement of the challenged provision of the Statute immediately;

d)  That the Court grant a permanent injunction against enforcement of the challenged provision of Statute;

e) That the Court award the Plaintiff's attorney's fees and cost as prevailing parties under 42 U.S.C. § 1988; AND

f) That the Court issue such other relief as is just and proper.

Respectfully submitted,

/s/Robert H. Patillo, II
Robert H. Patillo, II
Georgia Bar No: 940438


THE PATILLO LAW GROUP, LLC
250 Auburn Ave. Suite 301
Atlanta, GA 30303
404-590-5294
Fax: 404-525-5233
rpatillo@robertpatillo.com


/s/Janice L. Mathis
Janice L. Mathis
Georgia Bar No: 710950


The Rainbow PUSH Coalition
250 Auburn Ave. Suite 303
Atlanta, GA 30303
404-525-56634
janicelmathis@yahoo.com